IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WARFIELD PHILADELPHIA, L.P.        :        CIVIL ACTION
                                   :
        v.                         :
                                   :
NAT'L PASSENGER R.R. CORP.,        :        NO. 09-1002
et al.                             :

MEMORANDUM

Dalzell, J.                                    November 20, 2009

        Plaintiff Warfield Philadelphia, L.P. ("Warfield") sues

National Railroad Passenger Corporation ("Amtrak") for alleged

violations of Sherman Act §§ 1 and 2, infringement of its First

Amendment free speech rights, breach of contract, and tortious

interference with contract. Warfield also has asserted a claim

against U.S. Equities Realty, Inc. ("USER") for allegedly joining

with Amtrak in violating § 1 of the Sherman Act.

        Plaintiff would like to withdraw its claims against USER for

breach of contract and against Amtrak for tortious interference

with that contract. We will therefore grant the motions to

dismiss those counts as unopposed and now consider defendants'

motions to dismiss Warfield's remaining claims.

# I. **Factual Background**

According to the first amended complaint ("complaint"),[1] Warfield owns and operates a parking facility at 1600 South Warfield Street in Philadelphia. Compl. at ¶ 8. It charges $8.00 for twenty-four hours of parking and provides a shuttle to 30th Street Station ("Station"), which is the primary inter-city train station in Philadelphia. Id. at ¶ 9, 11. Amtrak owns and operates a parking facility next to the Station and charges $25 for twenty-four hours of parking. Id. at ¶ 10. Warfield alleges that "thousands of passengers" use the Station daily and that "many" of them get there by car and have luggage. Id. at ¶¶ 11-12. These people "need access to parking facilities that are either within reasonable walking distance of the station, or provide shuttle transportation to and from the station." Id. at ¶ 12.

Defendant USER is the management company for the Station, but it is not involved with Amtrak's parking garage. Pl. Br. at 1; Compl. at ¶ 46. In October of 2008, Warfield -- through its agent, Fox Realty Consultants, Inc. ("Fox") -- contracted with USER for a marketing table inside the Station. Compl. at ¶ 13.

---

[1] In ruling on defendants' motions to dismiss, we assume the veracity of the facts that Warfield alleged in the complaint.

Warfield paid $4,000 for twenty-one days of marketing table use and planned to promote its parking and shuttle services there. Id. at ¶¶ 14-15. It used the marketing table for about one day on October 1, 2008, but USER then sent plaintiff an email stating that "'[t]here is an exclusivity and conflict with the Amtrak garage so unfortunately we won't be able to have you return to 30th Street Station with your promotion.'" Id. at ¶¶ 16-17 (alteration in original). USER returned Warfield's $4,000 payment, and Warfield turned its attention to billboard advertising. Id. at ¶¶ 18-19.

On behalf of Warfield, Fox contracted with CBS Outdoor ("CBS") for the use of a billboard that plaintiff describes as "in proximity to 30th Street Station" and "located at 30th and Arch Streets in Philadelphia." Id. at ¶ 20. Warfield agreed to pay $2,500 to use the billboard from December 15, 2008 through January 11, 2009, and the proposed text for the billboard advertised Warfield's shuttle service and a fifty percent savings on parking at its lot. Id. at ¶¶ 21-22. On December 19, 2008, CBS told Warfield that Amtrak wrote a letter to CBS demanding that it remove the billboard, and CBS did so. Id. at ¶¶ 23-25.[2]

---

[2] Amtrak contends that the billboard is on its property
(continued...)

Based solely on Amtrak's actions regarding the marketing table and the billboard, Warfield contends that "Amtrak has effectively quashed any and all of Plaintiff's advertising efforts in or around 30th Street Station." Id. at ¶ 26. Plaintiff contends that Amtrak has "made it clear that it will not tolerate advertising anywhere near the Station by lower-cost parking companies." Pl. Br. at 2. But Warfield has pled no facts regarding any of its marketing attempts "in or around" the Station other than the billboard and marketing table and has not alleged that Amtrak controls any other marketing opportunities "anywhere near the station."

## II. <u>Analysis</u>

Warfield has announced in a footnote that it "withdraws" its breach of contract claim in Count IV against USER, but it remains "content" to pursue that claim against Amtrak. Pl. Br. at 33 n.16. Plaintiff also "withdraws" its tortious interference claim in Count V against Amtrak regarding its short-lived contract with

---

[2] (...continued)
and submitted public records that seem to establish that fact. We may consider public records in ruling on a motion to dismiss, but these records do not definitively show that the billboard at issue in this case is indeed the one on Amtrak's property. In any event, this fact is not critical for our decision, and so we will not address the parties' arguments on this point.

USER for the marketing table. Id. As mentioned above, we will

thus grant the motions to dismiss those claims as unopposed. The

remaining claims in plaintiff's complaint are for alleged

violations of (1) § 1 of the Sherman Act ("§ 1") against Amtrak

and USER (Count I), (2) § 2 of the Sherman Act ("§ 2") against

Amtrak (Count II), and (3) plaintiff's First Amendment free

speech rights against Amtrak (Count III).  Warfield also asserts

state law claims for Amtrak's alleged breach of contract

regarding the marketing table (Count IV), and Amtrak's supposed

tortious interference with Warfield's contract with CBS (Count

VI).[3]

-------------------------

[3] Warfield is less than clear in its allegations
regarding our subject matter jurisdiction over its state law
claims. Its statement on this point reads in full, "this Court
has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a)
because the state law claims included in this action are so
related to this federal question that they form part of the same
case or controversy." Compl. at ¶ 5.  But the parties are alleged
to be of diverse citizenship, and we cannot say to a legal
certainty that the controversy involves less than the
jurisdictional amount.
        We will dismiss the federal law claims in this case,
but as the remaining state law claims are relatively
straightforward, we will address them as well.  Thus, at a
minimum, in the interest of party and judicial economy, we will
exercise our discretion under 28 U.S.C. § 1367(c) to maintain
jurisdiction over the state law claims for the purposes of this
Memorandum and the accompanying Order.

Amtrak and USER have moved to dismiss all of these claims. Because Warfield has failed to plead facts that would support a finding of antitrust injury, we will dismiss Counts I and II. Regarding its free speech claim, Warfield has focused on the wrong fora and failed to establish that the fora at issue here -- the billboard and the marketing table -- constitute a public forum, or that Amtrak's actions were unreasonable or not related to a legitimate government purpose. We will therefore dismiss Count III. In Warfield's breach of contract and tortious interference claims against Amtrak it seeks to recover only lost profits, but it has failed to plead facts that would support that category of damages. We will thus grant Amtrak's motion to dismiss Counts IV and VI.

### A.    Standard for Motion to Dismiss

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Supreme Court has more recently refined Twombly to explain that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Ashcroft v.</u> <u>Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). In determining whether Warfield has stated a "plausible" claim for relief, the Supreme Court has instructed that we should "draw on [our] judicial experience and common sense." <u>Id.</u> at 1950. The facts in Warfield's complaint "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Twombly</u>, 550 U.S. at 555 (citations omitted).

Rather to the point regarding antitrust claims, the Supreme Court reminded us in <u>Twombly</u> that "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." <u>Id.</u> at 558 (citations omitted). <u>See</u> <u>also</u> <u>id.</u> at 559 ("the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings").

A complaint "does not need detailed factual allegations" but must include "more than labels and conclusions." <u>Id.</u> at 555. We do not presume, moreover, that the plaintiff's <u>legal</u> conclusions are true. <u>Id.</u> The Court in <u>Iqbal</u> described one process for evaluating a motion to dismiss:

> a court considering a motion to dismiss can choose to
> begin by identifying pleadings that, because they are
> no more than conclusions, are not entitled to the
> assumption of truth. While legal conclusions can
> provide the framework of a complaint, they must be
> supported by factual allegations. When there are
> well-pleaded factual allegations, a court should assume
> their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

We will use this framework to evaluate the defendants' motions to

dismiss.


### B. Plaintiff's Antitrust Claims

For Warfield to succeed on either of its antitrust claims,

it must show that it has "suffered an antitrust injury that is

causally related to the defendants' allegedly illegal anti-

competitive activity." Eichorn v. AT & T Corp., 248 F.3d 131, 138

(3d Cir. 2001). See also E & L Consulting, Ltd. v. Doman Indus.,

Ltd., 472 F.3d 23, 31 (2d Cir. 2006) ("A viable claim under

Section 2 . . . must, like a Section 1 claim, show a harm to

competition."). Antitrust injury is "the type the antitrust laws

were intended to prevent and that flows from that which makes

defendants' acts unlawful. The injury should reflect the

anticompetitive effect either of the violation or of

anticompetitive acts made possible by the violation." <u>Brunswick</u>
<u>Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977).

Warfield alleges that the relevant service market for its
antitrust claims is "parking facilities servicing people
traveling through 30th Street Station." Compl. at ¶ 29. It
contends that the geographic market "consists of persons or
entities offering parking services within reasonable walking
distance to 30th Street Station as well as those facilities
offering free shuttle service to and from 30th Street Station."
<u>Id.</u> at ¶ 30. More specifically, Warfield claims that the
geographic market "extends East to West from 29th Street to 32nd
Street and North to South from the Amtrak rail yards to Market
Street in Philadelphia." <u>Id.</u> at ¶ 31.[4]

Warfield claims that <u>it</u> has suffered damages from the
purported anti-competitive actions of Amtrak and USER, but the
post-<u>Brunswick</u> jurisprudence is clear that a plaintiff "has not
suffered an antitrust injury unless the activity has a wider
impact on the competitive market." <u>Eichorn</u>, 248 F.3d at 140. The

_____

[4] Defendants argue that plaintiff's alleged market is
not plausible.  While there may be force to this contention, we
will not reach that issue because we will dismiss plaintiff's
antitrust claims for failure to plead facts supporting antitrust
injury.

Second Circuit has explained that to show such antitrust injury a plaintiff must "identify[] the practice complained of and the reasons such a practice is or might be anticompetitive." <u>Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.</u>, 507 F.3d 117, 122 (2d Cir. 2007).

Amtrak contends that we should dismiss Warfield's § 1 and § 2 claims because it failed, <u>inter alia</u>, to allege an antitrust injury. In its response, Warfield makes much of our Court of Appeals's statement that "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss." <u>Brader v. Allegheny Gen. Hosp.</u>, 64 F.3d 869, 876 (3d Cir. 1995). But just three years after <u>Brader</u>, our Circuit affirmed a district court's granting of a motion to dismiss antitrust claims where the plaintiff failed to allege antitrust injury or a causal connection between the defendants' actions and the plaintiff's harm. <u>City of Pittsburgh v. West Penn Power Co.</u>, 147 F.3d 256, 265 (3d Cir. 1998). In <u>West Penn</u>, the Court of Appeals instructed that we "should first address the issue of whether the plaintiff suffered an antitrust injury." <u>Id.</u> If there is no antitrust injury, "further inquiry is unnecessary." <u>Id.</u> <u>See also</u> <u>Nicsand, Inc. v. 3M Co.</u>, 507 F.3d 442, 450 (6th Cir. 2007) (characterizing

antitrust standing, including antitrust injury, as a "threshold,

pleading-stage inquiry").

For Warfield properly to assert antitrust claims, it must

include factual allegations that are "more than labels and

conclusions" that could support a finding of antitrust injury.

See CBC Cos. v. Equifax, Inc., 561 F.3d 569, 572 (6th Cir. 2009)

(affirming dismissal of antitrust claims when the complaint only

offered "conclusory allegations" and "generalized allegations of

antitrust injury"); Kendall v. Visa U.S.A., Inc., 518 F.3d 1042,

1047-48 (9th Cir. 2008) (affirming dismissal of antitrust claims

where the plaintiffs "pleaded only ultimate facts, such as

conspiracy, and legal conclusions" and "failed to plead the

necessary evidentiary facts to support those conclusions"). Cf.

Willow Creek Fuels, Inc. v. Farm & Home Oil Co., No. 08-cv-5417,

2009 WL 3103738, at *4 (E.D. Pa. Sept. 18, 2009) (Jones, J.)

(holding that plaintiff alleged antitrust injury when it stated

that "businesses and municipalities in the . . . market area have

been harmed by suppressed competition resulting from Defendants'

acts that forced [plaintiff] out of the business and residential

petroleum product sales market"); Banxcorp v. Bankrate, Inc., No.

07-cv-3398, 2008 WL 5661874, at * 4 (D.N.J. July 7, 2008)

(partially denying motion to dismiss where plaintiff pled facts

that supported its claim that defendant caused harm to other competitors and competition in the bank rate market); Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-cv-0493, 2008 WL 2486134, at *4-*5 (M.D. Pa. June 17, 2008) (denying a motion to dismiss where plaintiff alleged, inter alia, that a false teeth supplier purchased and destroyed one dealer's supply of a competitor's teeth, prohibited dealers from carrying competitors' teeth, and made sure no dealer added competitors' teeth for six years).

In response to Amtrak's contention that Warfield has failed to allege facts to support an antitrust injury, Warfield claims that it has alleged the requisite antitrust injury through the following six "facts":

1. "'Upon information and belief, public parking facilities in the relevant geographic market...are limited to only three facilities: Plaintiff's facility, Amtrak's facility, and one other competing facility.'" Pl. Br. at 12 (quoting Compl. at ¶ 32).

2. "'Upon information and belief, Amtrak already accounts for the majority of parking revenues derived in the Relevant Market.'" Id. at 12 (quoting Compl. at ¶ 58).

3. "'By these actions, Amtrak formed one or more
   contracts, combinations and/or conspiracies with U.S.
   Equities and CBS in order to prevent Plaintiff from
   advertising its parking services in or around 30th
   Street Station, thereby unlawfully and unreasonably
   restraining competition in the Relevant Market.'" <u>Id.</u>
   (quoting Compl. at ¶ 43).

4. "'The effect of prohibiting such advertising in or
   around 30th Street Station is to reduce or eliminate
   competition in the Relevant Market.'" <u>Id.</u> (quoting
   Compl. at ¶ 52).

5. "'[T]he effect of [Defendants'] conduct is to
   unreasonably restrain the current low-cost provider of
   parking services from competing in the Relevant Market,
   and to preclude entry into the market of other
   potential low-cost providers.'" <u>Id.</u> (quoting Compl. at
   ¶ 53) (alterations in original).

6. "'If [Defendants] are permitted to exclude from the
   area in or around 30th Street Station all promotion of
   non-Amtrak owned parking services, Amtrak will be free
   to increase its parking charges beyond its current
   rates, which are already approximately three times

higher than Plaintiff's rates.'" <u>Id.</u> at 12-13 (quoting

Compl. at ¶ 54).

Warfield contends that it has adequately pled facts to show

antitrust injury because it has alleged that "there are only

three competitors in the market, and . . . the dominant player in

the market, whose prices are already three times higher, is

preventing the low-cost provider from advertising." Pl. Br. at

13.

Applying the Supreme Court's teachings in <u>Iqbal</u> and

<u>Twombly</u>,[5] we agree that plaintiff's rhetorical averments will not

suffice to support a claim that defendants have caused injury not

only to Warfield but also to competition in a cognizably relevant

market. For example, Warfield's third statement above is a litany

of legal conclusions regarding anything relevant to antitrust

---

[5] All of the cases that the parties cite on this issue
pre-date these recent Supreme Court decisions, and our own
research has revealed few decisions addressing the issue of
antitrust injury in the context of a motion to dismiss post-
<u>Iqbal</u>. We thus have little guidance regarding how the
<u>Twombly</u>/<u>Iqbal</u> framework should apply to this specific situation.
But as we discuss below, we are confident that plaintiff's
allegations of antitrust injury here do not cross the threshold
that this framework provides. Indeed, given the vaporousness of
plaintiff's factual pleadings, we very much doubt this would have
survived in the pre-<u>Twombly</u>/<u>Iqbal</u> universe.

injury[6] and thus are not entitled to a presumption of truth.
There are <u>no</u> facts in plaintiff's complaint to support its claims
that Amtrak's supposed restrictions on its parking advertising
reduced, restrained, or eliminated competition in the relevant
market or precluded others from entering it.[7] There is also no
evidence alleged that Amtrak has kept Warfield from advertising
everywhere "in or around" the Station -- it just mentions a
marketing table and one billboard. Warfield's Sherman Act claims
may not, moreover, survive a motion to dismiss simply by using
the word "effect." This is especially so here because without
more facts, the connection between Amtrak's interference with
Warfield's advertising -- which was minimal in comparison to the
universe of possible advertising options[8] -- and plaintiff's

---

[6] The assertion regarding Amtrak's motive or purpose is
not relevant to the question of whether plaintiff has alleged
harm to the market.

[7] There are, for example, no facts alleged about
Warfield's other attempts to advertise or how its inability to
advertise at 30th Street Station was so catastrophic, especially
in light of other available advertising options, <u>see</u> n.8 <u>infra</u>,
to reduce its profits.

[8] Plaintiff has not addressed this issue, but we take
judicial notice of the fact that Philadelphia -- with an
estimated population of more than 1.4 million people -- offers
businesses many ways to reach customers, including people who
travel to 30th Street Station. <u>See</u> U.S. Census, Population
(continued...)

15

purported (and unspecified) lost profits is not a plausible

inference. Warfield provides <u>no</u> connective tissue between the

purported cause of the harm and the harm it alleges has occurred.

Warfield offers no explanation as to how its inability to

advertise at the marketing table or on one billboard led to <u>any</u>

negative effect on its business <u>or</u> on the market. Warfield also

does not identify any other entity that may want to enter the

market it has defined.[9] Plaintiff's assertion about what Amtrak

---

[8] (...continued)
Finder, 2008 Population Estimate for Philadelphia County,
Pennsylvania, <u>available at</u> http://factfinder.census.gov. There
are, <u>inter alia</u>, daily and weekly newspapers, local magazines,
other billboard sites on the streets and highways leading to 30th
Street, bus shelters, and advertisements on buses and in subway
stations, to say nothing about the infinitude of cyberspace. This
is readily apparent and "generally known within the territorial
jurisdiction" of our Court. Fed. R. Evid. 201(b).

But even if we did not consider Warfield's other
obvious advertising options, we would still conclude that its
utterance of the word "effect" in this case does not support a
plausible inference of causation. Plaintiff must simply give <u>some</u>
explanation regarding how Amtrak's interference with the
marketing table and billboard harmed its bottom line in a
cognizably anti-competitive way.

[9] Warfield has alleged no facts to support its claims
regarding barriers to entry in the market.  Indeed, plaintiff --
who is already in the proposed relevant market -- has not claimed
that it has suffered such barriers, and there are no other
plaintiffs in this case to assert that claim. <u>See</u> <u>Nicsand</u>, 507
F.3d at 454 ("'Of course, a foreclosure alleged to be illegal
because it deters entry does not injure a plaintiff already in
the market. Impeding the entry of others grants a benefit to
(continued...)

may do in the future regarding parking rates is naked
speculation, and we will not presume that it is -- or will become
-- true.

From the six statements plaintiff identified regarding
antitrust injury, we are left with Warfield's assertions that
there are only three parking facilities in the purported relevant
market and Amtrak receives most of the revenues from those
facilities. These facts may be consistent with antitrust injury,
but they are nowhere near sufficient to support a plausible claim
that (1) competition in the market has suffered harm, or (2)
Amtrak's refusal to let Warfield advertise through a marketing
table at 30th Street Station and its interference with Warfield's
plans to advertise on one billboard caused such harm. Because
Warfield has failed to allege facts to support a conclusion that
there has been an antitrust injury or that defendants' actions
caused such an injury, we will dismiss its claims under §§ 1 and
2 of the Sherman Act.

---

[9] (...continued)
those already in the market.'" (quoting 2 Areeda & Hovenkamp,
Antitrust Law: An Analysis of Antitrust Principles and Their
Application at ¶ 348d3)).

## C.  **Freedom of Speech**

Warfield also contends that Amtrak violated its First Amendment free speech rights by prohibiting its "commercial speech" on the billboard and at the marketing table.[10] Complaint at ¶ 63. There is no question that with respect to the advertising at issue here Amtrak was "acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license." <u>Int'l Soc. for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 678 (1992). In analyzing free speech claims in situations like this, courts initially look to the type of forum at issue. <u>Id.</u>

Warfield asserts that the Station and surrounding area are the appropriate fora for this analysis and argues that they constitute "a non-traditional public forum that the government has designated as open to the public." Pl. Br. at 31. Regulation of speech on such property is "subject to the highest scrutiny," which survives only if "narrowly drawn to achieve a compelling state interest." <u>Krishna Consciousness</u>, 505 U.S. at 678. Plaintiff alleges that it has "sought access" to "the entire area

---

[10] Amtrak admits that it is a governmental actor for purposes of the First Amendment analysis. Amtrak Br. at 24 n. 10.

in and around 30th Street Station" and that this area "is open to both Amtrak passengers and members of the general public who visit the marketplace in and around said area to patronize the various commercial establishments . . . located within the area." Compl. at ¶ 66-67.

Amtrak argues that Warfield focuses on the wrong fora -- the entirety of 30th Street Station and the surrounding area[11] -- and contends that the proper forum is the advertising space to which plaintiff sought access. We agree with defendants on this point. The forum should be "defined . . . in terms of the access sought by the plaintiff." <u>Christ's Bride Ministries, Inc. v. Southeastern Penn. Transp. Auth.</u>, 148 F.3d 242, 248 (3d Cir. 1998). Plaintiff does not allege that it sought to advertise its parking services in the Station beyond the table's use, much less in the whole area around it. Moreover, Warfield "did not seek to leaflet, demonstrate, or solicit in the . . . [Station] as a whole" but "sought access only to the advertising space." <u>Id.</u> at 248. Plaintiff replies that cases such as <u>Christ's Bride</u> do not apply here because the marketing table "is not a discrete

---

[11] Warfield has pled no facts to show that the "multiple city blocks" in "the area surrounding 30th Street Station" are Amtrak's property or the property of <u>any</u> entity against whom it may assert claims for First Amendment violations.

19

advertising space, but merely a few square feet of the area that is open to the public." Id. Pl. Br. at 31. But Warfield does not claim that any member of the public could set up a table in the middle of 30th Street Station or that Amtrak generally permits this activity. Indeed, if anyone could set up a marketing table in the middle of the Station, plaintiff would not have paid as much as it did -- or for that matter have paid anything -- to do so.

Having established that the proper forum is the advertising space (here the billboard and marketing table), the next step is to determine what level of scrutiny applies to Amtrak's alleged refusal to permit Warfield to communicate its commercial speech in that forum. Warfield does not contend that the Station as a whole, much less the advertising space to which it sought access, is a traditional public forum. Instead, it claims that it is a "non-traditional public forum that the government has designated as open to the public." Pl. Br. at 31. If plaintiff is right, Amtrak's restrictions are valid only if "narrowly drawn to achieve a compelling state interest." Krishna Consciousness, 505 U.S. at 678. But if the forum does not fall into that category, Amtrak's actions "must survive only a much more limited review" and "need only be reasonable, as long as the regulation is not an

20

effort to suppress the speaker's activity due to disagreement with the speaker's view." Id. at 679.

Plaintiff argues that the Station is open to members of the public and that "train stations have evolved into public meeting places where people congregate not only prior to travel, but also to socialize and patronize the various commercial establishments therein." Pl. Br. at 31. Warfield also contends that a train station is different from an airport and that the reasoning of Krishna Consciousness -- which analyzed the public forum issue at three major airports in the New York City area -- does not apply here. But Warfield has not pled any facts from which it may be fairly inferred that Amtrak has opened the area to which Warfield sought access -- the marketing table and billboard -- to the public. Indeed, it alleges the contrary, as it concedes one must pay to avail oneself of either venue.  Warfield has thus failed to establish that the forum is a non-traditional public forum, and Amtrak's actions will pass muster if they were reasonable and viewpoint neutral.

In Warfield's complaint, it alleged that Amtrak's restrictions were "unreasonable because such conduct constituted a violation of antitrust laws, a breach of contract, and/or a tortious interference with contractual relationships" -- a

recitation of Warfield's other claims against Amtrak. Compl. at ¶ 72. But as we discuss in this Memorandum, we will dismiss those claims because Warfield has failed to plead sufficient facts to support them. These insufficient claims thus cannot support Warfield's contention that Amtrak acted unreasonably, and there are no other facts in plaintiff's complaint that could fairly or plausibly support such a conclusion.

Amtrak contends that its restrictions were reasonably related to a legitimate governmental interest because it was acting to protect the revenues from its own parking lot.[12] Amtrak argues that the facts in plaintiff's complaint regarding the competition between Warfield and Amtrak support this conclusion. But in deciding a motion to dismiss, we must make all inferences in favor of the <u>plaintiff</u>, and we therefore will not infer that Amtrak's motive was to protect its revenue from a competitor. On the other hand, it is Warfield's burden to plead facts that would

---

[12] In support of this argument, defendant cites Congress's admonition that Amtrak "maximize its revenues and minimize Government subsidies." 49 U.S.C. § 24101(d). Defendant also argues that protecting revenue is a legitimate government objective. Amtrak Br. at 28 (citing <u>Lehman v. City of Shaker Heights</u>, 418 U.S. 298, 304 (1974) (upholding a city transit system's regulation to prohibit political advertising because, among other reasons, "[r]evenue earned from long-term commercial advertising could be jeopardized")).

plausibly support a conclusion that Amtrak acted unreasonably or that its actions were unrelated to a legitimate governmental interest, and Warfield has not met that burden. Furthermore, Warfield did not respond to Amtrak's arguments regarding reasonableness and legitimacy and has thus tacitly conceded these points. Warfield instead continued to argue that its fora -- the Station and the surrounding area -- were proper and that strict scrutiny should apply.

Warfield has not pled facts that would show that the fora to which it sought access (the marketing table and the billboard) were open to the public. It has similarly failed to plead facts to show that Amtrak's actions were unreasonable or not related to a legitimate purpose -- and it has also conceded these points by not responding to them. We will therefore dismiss plaintiff's First Amendment claim.

### D. __Breach of Contract__

To assert a breach of contract claim under Pennsylvania law,[13] Warfield "must plead: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by

------

[13] There is no dispute that Pennsylvania law governs the contract-based claims in Warfield's complaint.

the contract; and 3) resultant damage." Presbyterian Med. Center v. Budd, 832 A.2d 1066, 1070 (Pa. Super. 2003). Amtrak moves to dismiss Warfield's breach of contract claim and argues that the plaintiff has insufficiently pled the damages element, since the only damages Warfield identifies in its complaint are unspecified "lost profits." See Compl. at ¶ 79.

To recover lost profits, however, Warfield must plead facts to show that (1) it can establish the lost profits "with reasonable certainty," (2) the alleged wrong was the proximate cause of the lost profits, and (3) "they were reasonably foreseeable." Delahanty v. First Penn. Bank, 464 A.2d 1243, 1258 (Pa. Super. 1983). Warfield acknowledges these requirements in its brief, Pl. Br. at 32, but it fails to identify any factual allegations in its complaint that could support any of these three requirements. Plaintiff pleads no facts regarding what profits it allegedly lost due to Amtrak's behavior regarding the marketing table[14] and suggests no way to calculate those profits "with reasonable certainty." As discussed earlier, Warfield has pled no facts to support causation and there is also nothing in

---

[14] Warfield bases this claim solely on Amtrak's alleged breach regarding the marketing table, so Amtrak's purported meddling with Warfield's billboard advertising plays no role in this part of the analysis.

the complaint regarding foreseeability. Even if plaintiff proved

every fact in the complaint, those facts would not support a

claim for lost profits. As lost profits are the only damages

plaintiff claims in Count IV, we will grant Amtrak's motion to

dismiss the breach of contract claim.

### E. **Tortious Interference**

Amtrak has also moved to dismiss Count VI, plaintiff's claim

that Amtrak tortiously interfered with Warfield's contract with

CBS for billboard advertising. For this claim, Warfield must

plead facts to show "(1) the existence of a contractual . . .

relationship between the plaintiff and a third party; (2)

purposeful action by the defendant, specifically intended to harm

an existing relationship . . . ; (3) the absence of privilege or

justification on the part of the defendant; [and] (4) legal

damage to the plaintiff as a result of the defendant's conduct."

Acumed LLC v. Advanced Surgical Services, Inc., 561 F.3d 199, 212

(3d Cir. 2009). Once again, Warfield only seeks lost profits as

its damages for its tortious interference claim. See Compl. at ¶

101. To recover lost profits for a tort claim, plaintiff must

show "evidence to establish them with reasonable certainty" and

proximate cause. Delahanty, 464 A.2d at 1258 (noting that

foreseeability is a requirement only to recover lost profits for contract claims). Because Warfield has failed to allege facts to support an award of lost profits, we will grant Amtrak's motion to dismiss this claim.

## III. <u>Conclusion</u>

Accordingly, we will grant as unopposed the motion to dismiss the breach of contract claim in Count IV as to defendant USER, as well as the tortious interference claim in Count V regarding Warfield's marketing table contract with USER. We will dismiss the remainder of Warfield's claims because it has failed to plead facts that suffice to support them.

BY THE COURT:

__\s\Stewart Dalzell